United States Court of Appeals for the Ninth Circuit is now in session. Please be seated. Good afternoon, everyone. This is the time and place set for argument in the case of Beeler v. Broomfield. Counsel, please proceed. Good afternoon, Your Honors. May it please the Court, Martha Van Landingham appearing on behalf of Petitioner Appellant Rodney Gene Beeler. I'd like to reserve ten minutes for rebuttal, and I'll keep an eye on my time. All right. Thank you, Counsel. Your Honors, I'd like to begin by reading two short quotes from judges who have previously examined this case and its claims. First, the District Court judge, even as he denied Mr. Beeler's petition, felt the need to express his frustration that this was a death penalty case, writing that he found it, and I quote here, troubling that this crime, a botched robbery by a man with no prior murders resulting in a single shooting death, needed to be charged as a capital case. But, Counsel, of course, we can't alter that charging decision. So what do you think we can do with that information in terms of what our task is? Well, one of our claims here, a non-certified claim, is a narrowing claim, which looks at the fact that the Supreme Court has mandated that the eligibility for the death penalty be genuinely narrowed. And here it clearly was not. From Furman to Gregg and many other cases on down, they looked at a system in which almost any murder could be charged as a capital case, yet very, very few actually were, and found that that resulted in a system in which the death penalty was capricious and arbitrary. And they required all of the states to change their death penalty at the legislative level to ensure that it not be so capricious and arbitrary, that it be narrowed at eligibility stage. And here, again, I think a lot of the uncertainty about this case is that it's not narrowed. It's not a clear worst of the worst case. Counsel, am I to take from your argument that your strongest argument is on an uncertified claim? No, Your Honor. I understand the practicalities involved in looking at that narrowing claim. And while I think it is a very, very serious matter that California has such a wide-open death penalty, I would like to turn to my next quote from one of the judges who looked at this case below, Judge Kennard of the California Supreme Court, and her words regarding the jury coercion claim, which is the one I would like to address first, if Your Honors are okay with that. Do you feel that the jury coercion claim, which is an uncertified claim, is stronger than the certified claims? Well, one of the issues that I think might make it stronger is that it is de novo review, not under AEDPA. And we can – would you like me to jump right into that? Well, no, it's your time, so if you choose to lead with that, that's fine. I just wanted to see your perspective in terms of the strength of the claims in this case. Go ahead and address the jury coercion claim, then. No, I do think it is a very strong claim, and I will go ahead and start with her words, if that's okay. She wrote in her dissent – and by the way, she was one of three out of seven total California Supreme Court justices, and the three dissented all quite strongly. And she wrote, Because reason, principle, and common human experience teach us that a deadline for deliberation and the death of a father are both substantial impediments to calm, dispassionate, focused decision making. Because the trial court took no steps to ameliorate the impact of these impediments, and because nothing in the record shows that these impediments did not have their ordinary and expected effects in this case, I would reverse the death penalty judgment. So this claim nearly evenly divided the California Supreme Court, even though it reviewed the case under extremely lenient state law standard about abusive discretion in not dismissing the juror whose father had died. So at that time, the evidence shows that the juror was divided on penalty, but then the trial judge sent a juror to tell the rest of the jury at the beginning of the day's deliberation that his father had just died, that he was leaving town in a couple of hours, and that if they didn't, quote, get this done right away, deliberations would be recessed for the rest of the week from Tuesday until the following Monday, requiring the jury to reconvene after the jurors had been told that they could expect to begin their summer vacations. So facing this sudden near-immediate deadline, the jury reached a death verdict within minutes. And that sort of coercion of a claim, that external pressure on deliberations, which had been ongoing for a couple of days at that point, is very much against precedent, including Lowenfeld v. Phelps. Although here we don't need clearly established federal law because it's de novo review. On that issue, though, counsel, how do you deal? We're supposed to presume that the state court considered the federal claim if they were addressing the equivalent of the state law claim. And here the dissent did talk about California and federal constitutions. So there's some reason to believe that the California Supreme Court was considering, you know, the equivalent federal claim, which would then push us into expert review. So can you address that concern? Absolutely, Your Honor. The text of the direct appeal opinion from the California Supreme Court focuses solely on California Penal Code Section 1089, again about abuse of discretion. It mentions two cases which themselves were decided only on state law grounds. But more concretely and directly, you have Justice Judge Kennard saying in her dissent, the majority analyzes the trial court's conduct in directing the jury to continue deliberations in the manner it did after the death of Michael C.'s father, solely in terms of Penal Code Section 1089. And then she goes on to say, more fundamental constitutional rights, however, are also implicated by the trial court's course of action in her dissent. So the Johnson v. Williams presumption is rebuttable, as that opinion states clearly. And here we have a very clear rebuttal of any indication of federal constitutional principles. And it's possible that – and there's also the fact that the dissent was before the majority when they reached their decision. And they chose, even with that chiding note from Justice Kennard, to continue with these state law grounds. And it's perhaps because the constitutional principles would have been more difficult and might have required the state to prove beyond reasonable doubt that the error was not harmless. So maybe they didn't want to tackle it on that basis. That's pure speculation. But there is nothing on the record to show that it was anything other than a state law basis. Well, to some extent, it's speculative that the majority didn't implicitly address the federal constitutional ground. Correct? Well, certainly you could see it that way, but Justice Kennard – of what she perceived as the primary basis for the majority ruling. Is that fair to say? Yes, it is. And the text itself, which has absolutely zero indication of consideration of federal constitutional principles. It's very clearly directed at the words of the 1089 statute and such. What do we do with the procedural default issue? There are a number of problems with the procedural default. First of all, the state in the supplemental reply only claims that the procedural default applies to the declarations, the four juror declarations that were submitted to bolster this claim on state habeas. The state does not say the claim itself is defaulted, only those four jurors. So does that mean that we don't consider the additional juror declarations? Actually, Your Honor, we do. Number one, first of all, that default allegation by the state now is waived because it was only raised at this reply. It was not raised before the district court. Before the district court were only the words, and this was early on in a motion to dismiss based on procedural default, where the state listed the California Supreme Court's own words. So at that point, they claimed the entire juror claim was waived, was defaulted, not just the supporting declarations. And second of all, the default itself should not apply because federal doctrine says that there is no default unless the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on the state procedural bar. Here you've got in the state habeas opinion, number one, they say claim F, the entire claim, is untimely. That is factually impossible considering that claim F was initially presented on direct appeal, not on state habeas. So it could not have been untimely as a whole because it was on direct appeal. Number two, they say one portion of the claim referring to issues with juror McCoskey is untimely. This is not the claim here with the coercion. And number three, so that shows that if they had wanted to say only the portion of the claim that was new on habeas, i.e. the declarations were untimely, they could have. But then the next indication that the procedural default is not clearly and expressly applied is that two of the justices on habeas would have granted an evidence in order to show cause on this portion, the juror coercion portion of the claim, including the juror declarations. So that shows that they were taking them into account and not considering them untimely. So, okay, number one, procedural default is waived. Number two, not clearly and expressly applied, so not inapplicable. And number three, even if the declarations were not to be taken into account, the record, the rest of the record still establishes the claim of juror coercion. I know that was a lot. I hope you were able to – I mean, I can clarify if there's any portion of that that you'd like more about. No, I think what you're saying is that the language referring specifically to McCloskey means that claim F, the procedural default ruling was only limited to the McCloskey issue. Is that what you're saying? Correct. Only that was untimely because that had been added later, as had to the coercion portion, the declarations. But they did not default the declarations or the coercion portion. And like I said, the allegation that the declarations alone are defaulted only appeared as part of this appeal, that I could find. I mean, maybe the State can correct me on that. Assuming you're right that there's no procedural default here, is it fair to say that the best you have on this record are really conflicting jury declarations-statements? Because the trial court did specifically ask the jurors whether they were influenced by the death of Coley and whether they felt rushed in any way. Nobody said a word. And that was right there contemporaneous with the verdict. The foreperson said it. Nobody said anything to the contrary. And I think the court even went further to say, does anybody disagree with that? And nobody said, I felt rushed. So now we've got these few declarations saying, well, you know, it was suggesting that it potentially was a factor. So we have conflicting declaration. And is the State court owed no deference on that record? Right. First of all, I mean, I could ‑‑ I have here the text of the polling. But instead of reading that to you, I think I'd rather share Justice Kennard's words on the poll itself, on how it worked. She said, the trial court's inquiry was cursory and ineffectual, consisting of only two questions to the panel as a whole. Only the jury foreperson answered. The trial court did not ask any questions individually of Juror Michael C. or any other juror. The manner in which the trial court framed the two questions it asked of the panel as a whole put the burden on any juror who disagreed with the foreperson's response to volunteer that disagreement and disown before the other jurors the verdict they had all just agreed to moments before. And that is effectively what happened. Not an adequate assertion of lack of coercion on the basis of the circumstances. And with regard to the inconsistent, the district court did agree with the State in declaring them inconsistent. But it did not note that they were consistent considering the disruption being due to the juror, to his coming in and his father's death requiring the end of the deliberations. And all of the declarations did show that there was an impact on at least two or three of the jurors. And per the law, only one, there needs to only be grave doubt as to whether even one had his or her vote impacted by the change in circumstances. So even if they don't all say we were impacted, number one, they don't, it doesn't even need to be a conscious process of changing their vote. And it need only apply to one. The declarations do show that. And this court can, in reviewing de novo, take into account the declarations because they were before the State court. They have been exhausted. So unless there are further questions on that issue, we could move on to one of the other claims. And I believe my next strongest claim to be IAC for failure to investigate evidence of organic brain damage in order to attack the intent to kill requirement of the special circumstance under which Mr. Beeler was sentenced to death. At that time, California was within what's referred to as the Carlos window after Carlos v. Superior Court added an intent to kill requirement to any special circumstance. And that was overturned four years later. But for this trial, that requirement was in place. And it meant that the State had the burden of proving to all of the jurors unanimously beyond a reasonable doubt that Mr. Beeler intended to kill Mr. Stevenson in the course of the crime. And had the jurors known about Mr. Beeler's severe brain damage, about the severe damage to his frontal bilateral lobes and his right temporal lobe that affected his ability to plan and his judgment, at least one would have found that there was some reasonable doubt considering intent to kill. Did any of the experts opine that Mr. Beeler's brain damage would have affected his ability to form intent? Well, that would not have been appropriate. Had they been, had the trial counsel done their jobs as constitutionally mandated and investigated all the red flags they had about this organic brain damage, and had they put on an expert, the expert would have explained to the jury the extent of the damage and the effect on Mr. Beeler's, you know. I thought Dr. Pincus did say in his report that Mr. Beeler had brain damage. Oh, you're correct, on habeas. That's when Mr. Pincus was hired. Oh, on habeas. Yes, at the time of trial. Even at that point, he didn't say that the brain damage affected his ability to form intent. So even post-verdict, he didn't say that it would have affected his ability to form the intent. So how does that help you? I think under California state law, an expert is not allowed to reach the final legal conclusion. All they can do is explain the brain damage to the jurors. He can say in his opinion, in his professional opinion, the brain damage would have affected his ability. He wouldn't be able to say that he was unable to form the intent, which would be the legal conclusion, but he could say that the brain damage, in his opinion, either affected or didn't affect his ability to form intent. Exactly, and that's exactly the gravamen of our claim here. But he didn't state that in his report. Because trial counsel did not hire him. I'm saying even on habeas. So if he didn't say that on habeas, how can we say that the trial counsel was ineffective for failing to pursue this avenue if what he would have obtained would have been this information? Well, first of all, trial counsel could have retained any experts and put them. I mean, it's not about what happens on habeas. It's what about the failure to make the argument to the jury. It is in a way because it tells us whether or not the ineffectiveness affected the outcome or had a possibility or reasonable likelihood of affecting the outcome. So if there was no evidence developed that the brain damage would have affected his ability to form the intent, there would be no prejudice and, therefore, no viable ineffective assistance of counsel claim. I agree, Your Honor, and I don't know. My suspicion is that Dr. Pincus was not asked to find intent to kill or not because that would not have been a conclusion he could have presented to the jury, and, therefore, he was not asked to include it in his post-conviction declaration because it wouldn't have been admissible at trial. So with regard to prejudice... But he did state that such brain damage can reduce the inhibiting controls and is mitigating or even exculpatory in some cases, so he kind of ventured into that arena. Correct. And my assertion and our claim is that had such evidence been presented to the jury, they then could, at least one juror, could have had reasonable doubt considering Rodney Beeler's intent to kill, especially considering the evidence about the crime itself, about the chaos in which it happened, about the ambiguity of exactly what happened, about Mr. Stevenson going after Mr. Beeler, who was shut into a bedroom with a rifle that he used to club against the door. All of that told to the jurors would have been compelling, and we only need at least one juror having a reasonable doubt. And with that, there would have been a reasonable probability that, absent trial counsel's ineffectiveness, at least one juror would have struck a different balance. And then the prejudice is that only one juror need to have had reasonable doubt, and the entire death penalty would have gone away. There would have been no eligibility for the death penalty, and Mr. Beeler would have been facing life without parole. So that is fairly stringent on-off prejudicial result in our view. Another thing I could quickly address has to do with the state court and the district court's reliance on the count of five psychiatrists. I do want to point out quickly, although it is in our briefing, that that is not correct. Trial counsel were not effective for hiring five psychiatrists. They retained two psychiatrists, two psychologists, I'm sorry, psychologists, Dr. Lenore Walker and Dr. Stephen Wells, to evaluate Mr. Beeler for mitigation at penalty phase. And both of them came back to trial counsel strongly suggesting that, with all the red flags of organic brain damage, that they retain specialists who could actually test and evaluate that aspect, that even though on penalty they could talk to the severe trauma Mr. Beeler had suffered throughout his life. And I don't need to go into the details of that again because they're horrendous. Even in addition to that, his brain had concretely physically been damaged, affecting how he would have reacted to the circumstances of the crime itself. At the time of the crime, he wouldn't have been able to process, plan, and judge. Anyway, those two psychologists, Dr. Walker and Dr. Wells, told trial counsel they needed to follow the step, and they failed to. They did not. Another psychologist, Dr. Cronella, billed for an hour. Dr. Coppett, number four here, was in fact Dr. Walker's assistant, helping her with interviews and such. And then finally the fifth one, Dr. Adams, was a mitigation specialist who was brought on because she was an expert on sexual trauma who worked with patients at Patton State Hospital. So again, nothing about these five experts went to organic brain damage except that they did note the red flags and urged trial counsel to follow up on that aspect. And is there anything else about this claim? Shall I move on? Oh, I have a yellow light. I think I'm at five minutes, so I should take my time. All right. Thank you, Carol. Good afternoon, and may it please the Court. Vincent LaPietra on behalf of Respondent. I'd like to address my friend's points in turn, beginning with the narrowing claim. This Court has already held that a reasonable jurist could not debate that the 1978 statute narrowly defines the class of deaf-eligible defendants. In this case in particular, as my friend noted, the special circumstances required intent to kill. So for that reason alone, an ordinary felony murder conducted in a residential burglary would not be eligible for the death penalty the prosecution had to establish an intent to kill. That alone narrows the class of defendants. Turning to the coercion claim. Can you address the standard of review? I want to hear a little bit more about what your thoughts are because as your opposing counsel points out, the state court opinion is completely silent on the federal aspect of the coercion claim.  And you do have one of the dissenting justices said, look, the majority really focuses their analysis solely on Penal Code Section 1089, I think it was. And that's a fair point, and I want to hear what the state thinks about whether that's enough to rebut the Johnson presumption. Well, I would say that this claim, that argument is foreclosed by Early v. Packer, in which case the United States Supreme Court said that state courts, state supreme courts need not cite or even be aware of federal claims just so long as the state court decision is not contrary to or an unreasonable application of that claim. So for that reason alone, I think that the state court is entitled to deference because Mr. Buehler presented it as a federal claim and it was rejected. And so the question is whether or not the rejection was unreasonable or contrary to. But as the court noted and as my friend noted, there was a discussion between the dissent and the majority about the standard that applied, the dissent expressly stating that they thought federal law required additional scrutiny beyond the state law standards. So under your argument, then, we give Justice Kennard's statement no force, no weight whatsoever. It was certainly her view that additional discussion was needed of the federal standard, but the majority disagreed and held that the state law was sufficient to safeguard any and all due process concerns. And that's certainly not unusual. State laws often are more protective or at least as protective as the federal standard, such as the case here. For example, in Lowenfeld, which is the clearly established federal law on this matter, the trial court polled the jury and found that it was deadlocked 11 to 1. It gave an Allen charge and the verdict was reached 30 minutes later. And that was insufficient to establish coercion. And even more on point is Early v. Packer where a deliberating juror expressly asked to be excused and the court declined that request and sent the juror back to deliberate. And the jury reached a verdict and the United States Supreme Court said that that was insufficient to establish coercion. And in this case, there was no coercion because the juror did not ask to be excused. He asked merely to be able to leave early in order to catch a flight home for a funeral. The court said, yes, we'll be able to do that. As this court noted before at the concern of defense counsel. Well, it's not just the juror whose father passed away. It's the other jurors who said that he came into the room and said, okay, well, you know, if we don't reach a verdict this afternoon, we'll have to put in an alternate and that's going to raise all kinds of complications. And the one holdout juror said, well, I felt pressured. I didn't want to take up people's time. What do we do with that? At the risk of complicating that, I would say the court correctly noted that at the time, each of the jurors were asked if this affected their judgment in any way, if they felt rushed, if they considered this, they all responded in the negative. Now, when it comes to the juror declarations, those were presented to the California Supreme Court for the first time in a second state habeas petition. Counsel for Beeler is correct in that in part of the order denying relief, it says parts of claim F are denied. I believe it was juror McCluskey are denied. But two paragraphs down, it said the following claims are denied as untimely. And it lists several of them. One of them is claim F, unqualified. So the entirety of claim F has been procedurally defaulted in the state court. And it is for that reason that the juror declarations, which were presented for the first time in a second state habeas, cannot be considered. But what does survive is the claim that was presented to the state Supreme Court on direct appeal. And that claim was unsupported by declaration and was reasonably rejected. The majority and the dissent discussed federal law, thereby indicating their awareness of the issue, as well as it having been raised in the opening brief. Let me slow you down for a second, make sure that I understand your position, because I'm reading this habeas denial and I get very confused because it specifically says claim F to the extent it challenges the failure to dismiss juror McCluskey is procedurally barred. Yes, Your Honor. And then it has this catch-all thing, and that's the catch-all phrase that you're relying on, the one that it says the following claims are procedurally barred as untimely, E, F, and I, right? Yes, Your Honor. And F is the current? F is this claim. Specifically, this is F.5A and F.5B, which were raised, I believe, in the reply brief as such. So you're making a distinction between the claim that was presented on direct appeal and the one on habeas? Is that the distinction you're making? I think that the claim that was presented on direct appeal was not procedurally defaulted, and it was denied as meritless for the reasons stated in the direct appeal opinion. Those reasons are entitled to deference, and under Early v. Packer, it's clearly not unreasonable. The declarations, which were presented as part of the second state habeas petition, those cannot be considered because they were part of a procedurally defaulted claim. But could he have raised them on direct appeal? Well, he could have raised them in his first state habeas petition. I see. So it's really not the direct appeal issue on which he couldn't have submitted the additional declarations anyway, but the first petition you're saying he failed to raise the coercion issue and put in the declarations, and so that's the basis for the procedural default? Yes, Your Honor. Okay. Any questions on the coercion claim? I'd like to turn now to the ineffective assistance of counsel claim, which is one of the certified issues. Could you address the narrowing issue? Yes, Your Honor. My position is that this court has rejected it in Mayfield v. Woodford, which is in our brief. Okay. Were you going to address the failure to investigate organic brain damage? Yes, Your Honor, right now. Okay. Yes. Mr. Buehler claims that counsel was ineffective for failing to investigate and present evidence of organic brain damage in the guilt phase, as what was argued today. As the court noted, no evidence has been presented in the trial court or in the habeas courts establishing that this organic brain damage affected Mr. Buehler's intent to kill. In the final request for a continuance that trial counsel filed with the state trial court, counsel specifically said, I have evidence establishing that Mr. Buehler has brain damage. What I'm looking for is evidence tying that to his ability to form an intent to kill or his ability to appreciate criminality. That is at supplemental excerpts of Record 77. That failing, which was recognized in the trial court, has never been cured. Simply put, there is nothing tying organic brain damage to the ability to form the intent to kill or appreciate the criminality in terms of the penalty phase. But stepping back from the arguments presented today, I just want to say that counsel clearly made an informed tactical decision to present a defense of third-party culpability, Mr. Jackley. Whether it was two psychologists or five psychologists or five psychologists, two psychologists with their helpers, the bottom line is that counsel was well aware of Mr. Buehler's mental health diagnoses, mental health history, had him evaluated, and decided not to present that as a defense at the penalty phase. He decided instead to present Mr. Jackley as the possible perpetrator. And I think that had he not done that, today we would be talking about ineffective assistance for failing to present evidence of third-party culpability. And as a backup to that claim, the argument was that whoever committed this crime lacked the intent to kill. Because there was evidence of a struggle, it did seem as though possibly this was a rash killing. But in order to present this evidence of mental health and say that Mr. Buehler lacked the intent to kill, he would have had to personalize all of this evidence towards Mr. Buehler. He would have to present evidence that Mr. Buehler had all of these mental health history problems and, of course, would have been subject to impeachment and rebuttal from the prosecution. So the informed tactical decision was one that should not be second-guessed today and that, frankly, in light of the lack of evidence implicating an ability to form the intent to kill, shouldn't be second-guessed. Counsel, could I go back to the accursion claim for a minute? Yes, Your Honor. What would be the standard of review on that claim if we were to address it? It would be deference under 2254. Do you think it would be AEDPA? Yes, Your Honor.  AEDPA as to the – well, quite frankly, it would be AEDPA as to either because the state Supreme Court denied it on the merits in the direct appeal and also in the alternative as meritless in the second state habeas petition. So the United States Supreme Court has said that state courts need not worry about such alternative rulings. It's procedurally barred and it's also meritless, that the federal courts would respect that. So even failing on the procedural bar, even ignoring the procedural bar, I should say, it was still denied as meritless and that meritless denial is itself entitled to deference and Mr. Buehler would have to establish that there was no reasonable basis for such a denial and in the face of Early v. Packer, that's simply not the case. Unless there are any questions, Your Honor. Appears not. Rebuttal. Thank you. I have a few notes here, although if you have any particular questions you'd like – Do you agree that we would be reviewing under the AEDPA standards? No, Your Honor, I do not.  Because to state that a state court can not only explicitly review on state law claim and that would still be considered reviewing on federal constitutional principles is senseless in light of the Johnson decision, which stated that you presume federal constitutional review, but it is rebuttable. And how can you say it is both rebuttable and yet to be seen even when there's absolutely no hint because it might have been something that one of the judges had heard somewhere at some point about the federal constitution. Well – I'm sorry, I put that a little bit rough. But Justice Kinnard did talk about state and federal constitutional principles, though. Correct, exactly. And that was the basis of her dissent, and that did go back to the majority. And they could have then thrown in a lip service to federal constitutional principles. They could have corrected it. They chose not to. But our cases say that the California court, the state court, does not necessarily have to discuss or be aware of the federal principles as long as their decision does not run afoul of those. What do we do with that line of cases? I say that here we're not in that line of cases because we have direct rebuttal by Justice Kinnard. She explicitly states. She gives us the rebuttal by saying they did not consider anything other than state law. But can we rely on a minority justice's view to make our ruling? She was right there in the middle of the discussion. She was. Yeah, but we generally don't rely on minority views to decide. Yes, but here you have the text from the majority, which shows no understanding of federal constitutional principles. You have direct rebuttal from somebody who was involved in the discussion, and you have the fact that that went back to the majority and they still did not add. Okay, let's assume we agree with you. Then you're saying we should do de novo review? I do think this is de novo because of the state law, but I want to say that even under AEDPA, you do have the majority unanimously saying that the trial court's fact-finding was faulty. Well, but it would have to be unreasonable determination of the facts. But what I wanted to ask you is about if we proceeded under AEDPA, you would have to give us a clearly established Supreme Court case that supports your position. What would be that clearly established Supreme Court case that would support your position that there was jury coercion here? Your Honor, it starts with Lowenfield v. Beehouse. Give me your strongest case to support your argument that the facts of this case support a determination that there was jury coercion. My strongest case, there are a number here that we can choose from. Well, most of the cases you cited talked about when the jury was deadlocked and was given instructions, and that's not what happened here. So I'm not sure that those cases would constitute clearly established Supreme Court cases. That's why I'm asking you, what's your strongest case? Because the cases involving a deadlocked jury, in my opinion, don't get you there. I agree, Your Honor. I do think the principles established in Lowenfield and other cases do get us there. But even without that, I want to go back to the majority's problems with the fact-finding. Under D-2, when the California Supreme Court unanimously, the majority found, there was a problem with the trial court's fact-finding, that should have triggered further fact-finding. Did you raise an argument that there was an unreasonable determination of the facts? Correct. You raised that argument here? I think we do. I can look that up and get back to you. I'm pretty sure we raised a D-2 argument. Well, at the time, in fairness, at the time of the direct appeal, they didn't have the benefit of the juror declarations, right? They just had the trial record. And in looking at the trial record, the juror came, had a conversation with the trial judge. The trial judge couldn't get in touch with the lawyers. So he said, well, continue deliberating. There was no problem to let the juror leave early to catch his 2 o'clock flight. None of the jurors piped up in response to the court's question. Did anybody feel any sort of pressure? Nobody said it. So it wasn't that the majority opinion erroneously evaluated the facts. They only had one set of facts. So it wasn't until habeas that these juror declarations came in, correct? Correct. What I'm referring to is where the majority opinion talks about the polling and says that was inadequate. The majority does find the trial court's polling was inadequate fact-finding. But yet, so under D-2, to not grant relief on that without on habeas later, without issuing an order to show cause, is unreasonable. And under D-2, we don't need clearly established federal law. And then when the habeas proceedings occurred, the second habeas proceeding, the one that resulted in the, I think, 2004 summary denial, the first line of that ruling did say the petition for writ of habeas corpus is denied on the merits, except as the Claim C, which we're not talking about here. So do you construe that as denial on the merits, and then they go on in the alternative to deem certain claims procedurally barred? Yes, and that merits decision is what we're calling an unreasonable. But that merits decision, being on the merits, takes you outside of de novo review, correct? Because the state court did address it on the merits. Oh, okay. This is where we get into the Ibarra-Kennedy line of cases, which takes the ILST look-through approach and expands it. Basically, under ILST and under Ibarra and Kennedy, what we've got here is a reasoned denial followed by unreasoned denials on the merits. And you look through to the reasoning given in the first denial. But this is where I struggle, because reading those line of cases, I didn't see anything that would apply to this factual situation where you supplemented the claim with additional declarations. So that's why I go back to how the Supreme Court had before it when it ruled on the coercion issue the first time around. It was reasoned, but it was without the benefit of the fuller record and, frankly, portions of the record that's more favorable to your coercive claim. So I don't know how logically look-through really applies in that situation. The way I read Ibarra, it does apply. So maybe I'm reading it incorrectly, but I do read Ibarra to say where a written opinion issues followed by summary decisions and the record improves between the issuance of the reasoned opinion and the later unexplained order, then the federal court addresses the reasoning of the state court in its earlier opinion in light of the full record ultimately placed before the later state court. So, again, maybe I'm reading that incorrectly, but that's exactly how I read Ibarra to apply to this situation here. Am I correct that we, the Ninth Circuit, have never addressed the situation where supplementation of evidence turns the claim into a new claim, or is that still related to the old claim? There's no circuit law on that question, correct? Aside from Ibarra itself, because there the record improved like it does here. Did it say whether or not that constituted a new claim, or did it say it related back to the old claim? It said it improved the record on the same claim. So Ibarra is your best case for that? Yes. I could also talk about how the prejudice on IAC penalty, part of that is shown by the fact that the jurors were delivering for a couple of days. There are a number of notes here. I don't know if you want me to... That's not unusual in a death penalty case.  I agree on that. All right, counsel. You've exceeded your time. Could you sum up, please? This case, it is just horrifying to me. I work on a lot of cases, but this one really should not be a death penalty case, and not just because of the facts, because of the clients, because of everything about it. It's also the fact that there were a number of constitutional violations within the trials that added up to making it a case that really deserves a good, strong review. All right. Thank you, counsel. Thank you to both counsel for your helpful argument. The case is argued and submitted for a decision by the court. We are adjourned. All rise. Quickly, Your Honors, thank you so much for rescheduling, for working with us on that case. Absolutely. Absolutely. A pleasure. This court, for this session, stands adjourned.
judges: RAWLINSON, NGUYEN, SUNG